IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PAMELA SYLVESTER,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　Plaintiff,　　　)
　　　　　　　　　　　　　　　　　　)
　　　　vs.　　　　　　　　　　　　　)　　　Civil Action No. 10 - 1012
　　　　　　　　　　　　　　　　　　)　　　Judge Nora Barry Fischer
MICHAEL J. ASTRUE,　　　　　　　　　)
Commissioner of Social Security,　　　　)
　　　　　　　　　　　Defendant.　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)

## MEMORANDUM OPINION

## I.　　INTRODUCTION

Plaintiff, Pamela G. Sylvester, ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("the Commissioner") denying her application for supplemental security income ("SSI") under Title XVI of Social Security Act, 42 U.S.C. §§ 1318-1383 (the "Act"). This matter comes before the Court on cross-motions for summary judgment filed by the parties pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Docket Nos. 9, 12). The record has been developed at the administrative level. For the following reasons, the Court finds that Plaintiff's Motion for Summary Judgment (Docket No. 9) is GRANTED, in part and Defendant's Motion for Summary Judgment (Docket No. 12) is DENIED. The decision of the Administrative Law Judge ("ALJ") is VACATED and this matter is REMANDED for further consideration.

## II.　　PROCEDURAL HISTORY

Plaintiff initially filed an application for SSI on March 19, 2004 alleging disability onset as of May 30, 2000. (R. at 72). After denials at the administrative level, Plaintiff's claims were denied by the United States District Court on March 5, 2009. *Sylvester v. Commissioner of Social Security*, 08-0665, 2009 WL 563902 (W.D. Pa. Mar. 5, 2009).

Plaintiff filed new applications on April 25, 2008, and her claim was denied on August 27, 2008. (R. at 44-54). Her request for a review on October 3, 2008 was granted, and a hearing was held before Administrative Law Judge William E. Kenworthy in Pittsburgh, Pennsylvania on January 25, 2010, where Plaintiff was represented by Steven F. Kessler, Esq. (R. at 57-63, 22-41). ALJ Kenworthy issued an unfavorable decision on February 4, 2010. (R. at 9-18). On June 12, 2010, the Appeals Council denied Plaintiff's request for review, making the ALJ's February 4, 2010 decision the final decision of the Commissioner. (R. at 1-5).

The instant action was initiated when Plaintiff filed a Complaint in this Court on August 4, 2010, pursuant to 42 U.S.C. § 1631(c)(3) for claims under Title XVI. (Docket No. 4). Defendant filed his Answer on October 12, 2010. (Docket No. 6). Plaintiff's Motion for Summary Judgment and accompanying Brief were filed on October 29, 2010. (Docket No. 9). Defendant's Motion for Summary Judgment and accompanying Brief were filed on November 30, 2010. (Docket No. 12, 13).

III. **STANDARD OF REVIEW**

Judicial review of the Commissioner's final decision on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[1] and 1383(c)(3)[2]. Section 405(g) permits a district court to review transcripts and records upon which a determination of the Commissioner is based.

---

[1] Section 405(g) provides, in pertinent part:

Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a

When reviewing a decision denying SSI, the district court's role is limited to determining whether substantial evidence exists in the record to support the ALJ's findings of fact. *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Diaz v. Com'r of Soc. Sec.*, 577 F.3d 500, 503 (3d Cir. 2009) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (internal quotation marks and citations omitted). Further, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. *See* 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390.

A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh evidence of record. *Fennell v. Astrue*, 2010 U.S. Dist. LEXIS 136029, *35 (W.D. Pa. Dec. 23, 2010); *accord Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion [...] so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings"). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

To be eligible for social security benefits under the Act, a claimant must demonstrate that he or she cannot engage in substantial gainful activity because of a medically determinable

---

civil action [...] brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).
[2] Section 1383(c)(3) provides, in pertinent part:
The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423 (d)(1)(A); *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000); *see also Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986).

An ALJ must utilize a five-step sequential analysis when evaluating the disability status of a claimant. 20 C.F.R. § 404.1520. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., pt. 404 subpt. P., appx. 1 (*see* 20 C.F.R. §§ 416.920(d), 416.925, 416.926); (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. § 404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003).

If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given the claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

IV.    **STATEMENT OF FACTS**

A.    *General Background*

Plaintiff was born on October 11, 1971 and claims disability beginning March 31, 2006. (R. at 103). She lives alone in an apartment in Pittsburgh, Pennsylvania and has not worked

4

since the year 2000.  (R. at 104, 123).  Plaintiff graduated from high school and received a two-year associate degree from Community College of Allegheny County in 1993.  (R. at 393).

When Plaintiff was two years old, her parents divorced, and her mother began dating her stepfather.  (R. at 366).  Plaintiff alleges that her stepfather mentally, physically and sexually abused her until he left the family when Plaintiff was ten or twelve years old.  (R. at 366, 392).  According to Plaintiff, her mother had a long history of drinking and drug abuse, and she ultimately committed suicide in 2004.  (R. at 132, 393).  Plaintiff's father was an alcoholic.  (R. at 393).  Plaintiff has two sisters and one brother.  (R. at 392).  However, she speaks with her youngest sister less frequently, because, according to Plaintiff, she is abusing drugs and dating their stepfather.  (R. at 366, 367).  Plaintiff alleges that her sister also suffers from mental illness, is an alcoholic, and uses "street drugs."  (R. at 393).

Plaintiff has been in two car accidents.  (R. at 132).  The first, in 1999, occurred when she was driving, and as a result, Plaintiff had whiplash and low back problems.  (R. at 393).  In July 2000, she was involved in a high speed motor vehicle accident in which her head went through the windshield.  (R. at 177).  Because of this accident, she has nerve problems in her neck.  (R. at 393).  She has attempted suicide once.  (R. at 132).

Although currently unemployed, Plaintiff's previous jobs include working as a health care aide in a personal care home, a front end worker in a dry cleaning business, a secretary for a temporary agency, a driver for a taxi company, a customer service representative, and most recently, a census representative for the government.  (R. at 123).

**B.**     ***Medical Background***

*1. <u>Previous Medical History</u>*:

Plaintiff had a LEEP procedure[3] for cervical cancer in October 2005. (R. at 174, 177). Plaintiff also smoked one pack of cigarettes per day for 15 years and has attempted to quit in recent years. (R. at 174). She drinks an occasional alcoholic beverage. (R. at 174). She has also been diagnosed with hepatitis C, depression, OxyContin[4] addiction, and secondary to low back pain. (R. at 177). She used heroin and hard drugs for a number of years but has been clean since 2004. (R. at 177). Plaintiff has been taking suboxone,[5] prescribed by Dr. Melinda Campopiano, to assist in overcoming her drug addiction since October 2003. (R. at 370). According to Dr. Maureen A. Maulak, O.D., Plaintiff's vision is unimpaired with correction as of June 4, 2005. (R. at 391). Plaintiff stated that her doctor ordered a mammogram on June 18, 2008 and a lump was found in her right breast. (R. at 303). However, the results were benign. (R. at 393).

### 2. *Dr. Melinda Campopiano, M.D.*

On July 12, 2006, Plaintiff reported to her treating physician, Dr. Campopiano, complaining of pain and numbness in her arms. (R. at 171). Upon evaluation of an MRI[6] of Plaintiff's cervical spine, Dr. Campopiano determined that Plaintiff had multilevel degenerative

---

[3] "LEEP" is an "abbreviation for loop electrocautery excision procedure; loop electrosurgical excision procedure, or electrocautery excisional biopsy of abnormal cervical tissue." Stedman's Medical Dictionary 1063, 1563 (28th ed. 2006).

[4] "OxyContin" is "a group of drugs similar to narcotic pain relievers. It is similar to morphine. OxyContin tablets are used to treat moderate to severe pain. The extended-release form of this medication is for around-the-clock treatment of pain. Oxycodone is not for treating pain just after a surgery unless you were already taking oxycodone before the surgery." Drugs.com, Oxycontin, *available at*: http://www.drugs.com/oxycontin.html (last visited 2/4/11).

[5] "Suboxone" is "a combination of buprenorphine and naloxone. Buprenorphine is an opioid medication. Buprenorphine is similar to other opioids such as morphine, codeine, and heroin however, it produces less euphoric ("high") effects and therefore may be easier to stop taking." Drugs.com, Suboxone, *available at*: http://www.drugs.com/suboxone.html (last visited 2/4/11).

[6] "MRI" is an "abbreviation for magnetic resonance imaging." Stedman's Medical Dictionary 1232 (28th ed. 2006).

disc disease, most severe at C4-5 and C5-6[7] with severe central canal stenosis[8] and severe neural foraminal stenosis[9] with possible mild associated cord edema.[10] (*Id.*). She also found that Plaintiff had left disc central disc protrusion[11] at C6-7 with severe left neural foraminal stenosis.[12] (*Id.*).

Plaintiff met with Dr. Campopiano several times from March 2006 to June 2007 at her office at UPMC Shadyside. (R. at 203-229). During the majority of these visits, Dr. Campopiano rated Plaintiff's general exam as "normal" without checking any box as "abnormal." (R. at 203-05, 207-10, 212, 214, 216, 218, 222). On two occasions, Dr. Campopiano rated Plaintiff's "psych" as "normal" as well. (R. at 206, 221). Plaintiff was also rated once as "abnormal" in both her "extremities" and "head/neck." (R. at 211). During several visits, Dr. Campopiano rated Plaintiff's "psych" as "abnormal" and marked either "aggravated," "sad," or "tearful." (R. at 215, 217, 219, 220, 223).

### 3. *November 2006: Dr. Daniel Wecht, M.D.*

Dr. Campopiano referred Plaintiff to Dr. Wecht for a neurosurgical consultation on November 22, 2006. (R. at 174). Plaintiff reported neck stiffness with some aches in the back of her neck and no upper extremity symptoms at that time. (R. at 174). Dr. Wecht found her to be

---

[7] "C" is an "abbreviation or symbol for cervical vertebra." Stedman's Medical Dictionary 285 (28th ed. 2006).

[8] "Stenosis" is a stricture of any canal or orifice." Stedman's Medical Dictionary 1832 (28th ed. 2006).

[9] "Foramina" is "an aperture or perforation through a bone or a membranous structure," and "stenosis" is a stricture of any canal or orifice." Stedman's Medical Dictionary 756, 1832 (28th ed. 2006).

[10] "Edema" is "an accumulation of an excessive amount of watery fluid in cells or intercellular tissues or at the gross level, used to describe the physical sign commonly likened to swelling, or increased girth that often accompanies the accumulation of fluid in a body part, most often a limb." Stedman's Medical Dictionary 613 (28th ed. 2006).

[11] "Protrusion" is "the state of being thrust forward or projected." Stedman's Medical Dictionary 1586 (28th ed. 2006).

[12] Foraminal stenosis, *supra* note 9.

alert and oriented. (R. at 174). Plaintiff's cervical range of motion demonstrated no difficulty or pain, and the reflexes in her upper extremities were intact and symmetrical. (R. at 175). While Dr. Wecht found no immediate need for surgery, he felt it reasonable for Plaintiff to undergo surgery in the form of an anterior cervical diskectomy[13] by fusing C5 and C7 with plating. (R. at 175). Dr. Wecht answered Plaintiff's questions about this procedure, and Plaintiff verbalized her understanding. (R. at 175).

### 4. *April 2007: Dr. Monte B. Weinberger, M.D.*

Because Plaintiff felt that Dr. Wecht was not thorough with her, she sought a second evaluation with Dr. Weinberger. (R. at 177). Plaintiff reported that her neck was "always tense" and her left arm had frequent pain and numbness. (R. at 177). Dr. Weinberger found that Plaintiff's reflexes were brisk and her cervical range of motion was full. (R. at 177). After reviewing the same MRI that Dr. Campopiano reviewed, Dr. Weinberger also ordered and reviewed a CT scan[14] and myelography.[15] (R. at 177, 263, 265). Upon review of these documents, Dr. Weinberger diagnosed Plaintiff with advanced cervical spondylosis[16] and recommended physical therapy. (R. at 196).

### 5. *May 2007, October 2007: Center for Rehabilitation Services*

---

[13] "Diskectomy," or "discectomy," is an "excision, in part or whole, of an intervertebral disk." Stedman's Medical Dictionary 550 (28th ed. 2006).

[14] "CT scan," or "computed tomography," is "imaging anatomic information from a cross-sectional plane of the body, each image generated by a computer synthesis of x-ray transmission data obtained in many different directions in a given plane." Stedman's Medical Dictionary 1996 (28th ed. 2006).

[15] "Myelography" is "radiography of the spinal cord and nerve roots after the injection of a contrast medium into the spinal subarachnoid space." Stedman's Medical Dictionary 1269 (28th ed. 2006).

[16] "Cervical spondylosis" is "ankylosis of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature; affecting the cervical vertebrae, intervertebral discs, and surrounding soft tissue." Stedman's Medical Dictionary 1813 (28th ed. 2006).

Plaintiff started physical therapy with Center for Rehabilitation Services on May 16, 2007. (R. at 201). During that visit, she claimed her pain was a seven out of ten, ten being "extremely intense." (R. at 197). Craig Doman, M.P.T., found that Plaintiff had decreased strength of her bilateral rhomboids, middle trapezius, and lower trapezius and decreased flexibility of her bilateral upper trapezius, levator scapulae, and pectoralis minor.[17] (R. at 190). However, Plaintiff was discharged from care because of her failure to return or schedule any further appointments after May 30, 2007. (R. at 189).

Plaintiff returned to physical therapy with Center for Rehabilitation Services on October 15, 2007. (R. at 230). She self-reported that her condition developed as a result of a number of incidents: being attacked and beaten by men, two motor vehicle accidents, one in 1998 and one in 2001, her work as a home health aide in which she had to lift patients, and following her depression and past suicide attempt. (R. at 249). She rated her pain at that time as a five out of ten, with ten being "extremely intense." (R. at 248). Lauren DeFilippi, M.P.T., determined that Plaintiff's impairments include decreased strength of bilateral shoulder musculature and decreased flexibility of bilateral upper trapezius, levator scapulae, and pectorals. (R. at 243). However, Plaintiff was again discharged from care because of her failure to return or schedule any further appointments after October 29, 2007, her fourth visit. (R. at 241).

### 6. *October 17, 2006-May 20, 2008: Mercy Behavioral Health*

To address her mental health concerns, Plaintiff met with staff members and psychiatrists at Mercy Behavioral Health regularly from October 17, 2006 to May 20, 2008. Dr. Michael

---

[17] "Bilateral rhomboids" "denote a ligament and two muscles." "Trapezius" is the "extrinsic (thoracoappendicular) m. of shoulder." "Levator scapulae" is "one of several muscles with an action to raise the part to which it inserts." "Pectoralis minor" is the "breast bone." Stedman's Medical Dictionary 1269, 1256, 1078, 1445 (28th ed. 2006).

Frantz, M.D. prescribed Lexapro[18] for her during this time period. (R. at 280). During her counseling sessions, Plaintiff was consistently diagnosed with Bipolar Disorder, NOS,[19] and assigned GAF[20] scores of 45, 48 and 50. (R. at 281, 285, 287, 288, 296, 299, 303, 309, 313, 314, 320, 326, 330, 377). She frequently denied suicidal ideation, intention, plans and history but admitted that she needed help coping with her mother's suicide. (R. at 281, 282, 285, 286).

Dr. Frantz noted that Plaintiff reported some suicidal ideation and previous attempts at suicide, though Plaintiff could not recall how many times she tried to injure or kill herself. (R. at 328). Plaintiff also reported magical thinking, specifically the ability to wish things on people who did wrong by her, although she did not specifically want to hurt other people. (R. at 328). He felt that Post Traumatic Stress Disorder, "PTSD," should be considered because of severe and significant trauma and abuse throughout Plaintiff's childhood and adulthood, including sexual abuse by several family members during her childhood. (R. at 328). He believed that Plaintiff

---

[18] "Lexapro is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRIs). It affects chemicals in the brain that may become unbalanced and cause depression or anxiety. Lexapro is used to treat anxiety in adults and major depressive disorder in adults and adolescents who are at least 12 years old." Drugs.com, Lexapro, *available at*: http://www.drugs.com/lexapro.html (last visited 2/4/11).

[19] "Bipolar disorder" is "an affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes. The DSM (Diagnostic and Statistical Manual of Mental Disorders) specifies the commonly observed patterns of bipolar I and bipolar II disorder and cyclothymia." Stedman's Medical Dictionary 568 (28th ed. 2006).

[20] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." A GAF score of between 31-40 denotes "severe symptoms" with some impairment in reality testing or major impairments in several areas. American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ..."; of 20 "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication...." *Id.*

had trouble tolerating stress, and he diagnosed her with major depressive disorder, recurrent, moderate, PTSD, and borderline personality traits. (R. at 328, 330).

Plaintiff's counselor, Laurie Miklavic, M. Ed., noted that Plaintiff frequently discussed good and evil and stated that she "feels God works powers through her" and that the devil is "out to get her." (R. at 375). Plaintiff also reported hallucinations to her counselor including visions of ghosts and angels. (R. at 382).

During one session, Plaintiff expressed an interested in working or attending school but stated that she was "waiting to hear about her SSI appeal." (R. at 297). Her treatment plan recommended that Plaintiff either go back to school or obtain employment. (R. at 306).

### 7. *Consultative Examination Report: July 2008: Dr. Anthony J. Fallica, Ph.D.*

On July 16, 2008, Dr. Anthony Fallica personally observed Plaintiff for a consultative examination. (R. at 437). He noted that she appeared to be suffering from back pain. (R. at 394). She spoke at a slightly rapid rate and exhibited mild tangential thinking. (R. at 394). Plaintiff admitted to visual hallucinations, including seeing ghosts in her house, unusual tactile experiences, and suicidal ideations within the previous year. (R. at 394). She stated that she generally felt down and claimed one of the reasons was that going to the social security office made her nervous because the outcome would affect her future. (R. at 396). Plaintiff also stated that she was raped at gunpoint while she was still using heroin. (R. at 396).

Dr. Fallica noted that Plaintiff was oriented, had very good verbal memory and fair to good general knowledge, and her attention efforts were unimpaired. (R. at 397). She correctly completed simple calculations and serial sevens but failed to complete a problem requiring some

mathematical reasoning abilities. (R. at 397). While her social judgment appeared to be mildly impaired, she exhibited minimal insight into her problems. (R. at 397).

Dr. Fallica determined that Plaintiff suffered from major depressive disorder, recurrent with psychotic features associated with possible borderline personality traits complicated by her reported hepatitis C, cervical spondylosis and cervical cancer. (R. at 398). He noted that symptomology should be ruled out for posttraumatic stress disorder in response to her reported physical and sexual abuse occurrences beginning at an early age up to four years ago when she claimed to have been raped at gunpoint. (R. at 398).

In his opinion, Dr. Fallica found Plaintiff to have no restrictions in the following areas:

- Understand and remember short, simple instructions
- Carry out short, simple instructions
- Interact appropriately with the public
- Interact appropriately with supervisor (s)
- Interact appropriately with co-workers

(R. at 438).

He also noted that Plaintiff was slightly limited in her ability to make judgments on simple work-related decisions, to respond appropriately to work pressures in a usual work setting, and to respond appropriately to changes in a routine work setting. (R. at 438). Finally, Dr. Fallica found moderate limitations in Plaintiff's ability to understand and remember detailed instructions and carry out detailed instructions. (R. at 438).

8. *Mental Residual Functioning Capacity Assessment and Psychiatric Review Technique: July 2008: Dr. Roger Glover, Ph.D.*

Dr. Roger Glover, Ph.D. evaluated Plaintiff's file, primarily relying on Dr. Fallica's report, and found that she was not significantly limited in the following areas:

- The ability to remember locations and work-like procedures
- The ability to understand and remember very short and simple instructions
- The ability to carry out very short and simple instructions
- The ability to sustain an ordinary routine without special supervision
- The ability to work in coordination with or proximity to others without being distracted by them
- The ability to make simple work-related decisions
- The ability to interact appropriately with the general public
- The ability to ask simple questions or request assistance
- The ability to accept instructions and respond appropriately to criticism from supervisors
- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes
- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness
- The ability to be aware of normal hazards and to take appropriate precautions
- The ability to set realistic goals or make plans independently of others

(R. at 400-401).

Dr. Glover determined that Plaintiff was moderately limited in the following areas:
- The ability to understand and remember detailed instructions
- The ability to carry out detailed instructions
- The ability to maintain attention and concentration for extended periods
- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances
- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods
- The ability to respond appropriately to changes in the work setting
- The ability to set realistic goals or make plans independently of others

(R. at 400-401).

Dr. Glover did not determine that Plaintiff was markedly limited in any category. (R. at 400-401). Dr. Glover believed that Plaintiff could understand, retain, and follow simple job instructions and perform one and two step tasks. (R. at 402). He believed that an RFC assessment was necessary based on 12.04 affective disorders and 12.09 substance addiction disorders. (R. at 403). Finally, Dr. Glover diagnosed Plaintiff with major depressive disorder. (R. at 406). He found no episodes of decompensation. (R. at 413).

9. *Consultative Examination Report: July 30, 2008: Dr. Nosratollah Danai, M.D.*

Dr. Nosratollah Danai personally evaluated Plaintiff on July 30, 2008. (R. at 417). He observed that Plaintiff was a poor historian. (R. at 417). Plaintiff's chief complaint was severe pain of her back, neck, and mid back with radiation to both shoulders. (R. at 417). She also complained of depression and noted her prior hepatitis C diagnosis. (R. at 418). At the time of the appointment, Plaintiff still smoked half a pack to one full pack of cigarettes daily. (R. at 418). Dr. Danai found that Plaintiff's range of motion for her cervical spine and extremities was within a normal range. (R. at 420). However, she had pain in her upper thoracic spine, making it difficult for her to function. (R. at 420). Dr. Danai diagnosed her with cervical neuropathy, depression, hepatitis C, a history of chemical dependency, and a history of cervical cancer with treatment. (R. at 420). He determined that Plaintiff could frequently carry or lift 2-3 pounds, occasionally carry or lift ten pounds, stand and walk a total of one to two hours per day, sit two hours per day, and is limited in her upper extremities. (R. at 422).

10. *Physical Residual Functioning Capacity Assessment: August 2008: Dr. Edward Zhoyovsky*

Dr. Zhoyovsky evaluated Plaintiff's file based on all of the evidence of record on August 18, 2008. (R. at 429). He determined that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk three hours a day, sit about six hours in an eight hour day, use ramps, and climb stairs. (R. at 430). According to Dr. Zhoyovsky, Plaintiff had no established manipulative, visual, communicative, or environmental limitations. (R. at 431-432).

Dr. Zhoyovsky determined that the evidence established the medically determinable impairments of degenerative disc disease and hepatitis C. (R. at 434). As a whole, he found

Plaintiff's statements to be partially credible. (R. at 434). Plaintiff's daily activities, as she described them, did not appear to Dr. Zhoyovsky to be significantly limited in relation to her alleged symptoms; however, she required an assistive device to ambulate. (R. at 434). Further, treatment has generally been successful in controlling those symptoms. (R. at 434). At the time of Dr. Zhoyovsky's analysis, Plaintiff was not attending physical therapy and was not prescribed narcotic medications for her pain. (R. at 434). Dr. Zhoyovsky believed that Dr. Danai's analysis of Plaintiff's abilities overestimated the severity of her restrictions and sharply contrasted the other evidence in the record; thus, he gave it less weight. (R. at 435).

### 11. *Office Treatment Records: January 29, 2009 – July 14, 2009: North Shore Family Health*

Plaintiff visited North Shore Family Health several times from January 2009 to July 2009. During most visits, she was diagnosed with a history of opiate dependence, chronic back pain, and anxiety. (R. at 441). She was prescribed suboxone,[21] Flexeril,[22] and Xanax.[23] (R. at 441, 442, 445, 446). She was also diagnosed with depression, cervical spondylosis, and a right breast lump, for which she received a mammogram on April 2, 2009. (R. at 443, 444, 445). She noted during a February 2009 visit that her twelve-year-old niece and a friend's mother had both passed away that week. (R. at 445).

### 12. *Dr. David Anthony, MD*

---

[21] Drugs.com, Suboxone, *supra* note 5.

[22] "Flexeril" is "a muscle relaxant. It works by blocking nerve impulses (or pain sensations) that are sent to your brain. Flexeril is used together with rest and physical therapy to treat skeletal muscle conditions such as pain or injury." Drugs.com, Flexeril, *available at*: http://www.drugs.com/flexeril.html. (last visited 2/4/11).

[23] "Xanax is in a group of drugs called benzodiazepines. It affects chemicals in the brain that may become unbalanced and cause anxiety. Xanax is used to treat anxiety disorders, panic disorders, and anxiety caused by depression." Drugs.com, Xanax, *available at*: link. (last visited 2/4/11).

Dr. David Anthony conducted several psychiatric sessions with Plaintiff in person from November 18, 2008 to July 23, 2009. (R. at 560). He diagnosed her with major depressive disorder, post-traumatic stress disorder, and opiate dependence. (*Id.*). Dr. Anthony also determined that Plaintiff had moderate restriction of activities in daily living, and marked difficulty in maintaining social functioning. (*Id.*). He found that Plaintiff had deficiencies of concentration, persistence or pace and repeated episodes of deterioration or decompensation in a work-like setting. (*Id.*). Dr. Anthony noted that Plaintiff was not significantly impaired in only one area: her ability to make simple work-related decisions. (R. at 560).

Dr. Anthony determined that Plaintiff was extremely impaired in the following areas:

- The ability to carry out detailed instructions
- The ability to travel in unfamiliar places or use public transportation

(R. at 560-561).

Dr. Anthony determined that Plaintiff was markedly impaired in the following areas:

- The ability to understand and remember short and simple instructions
- The ability to maintain attention and concentration for extended periods
- The ability to work in coordination with and proximity with others without being distracted by them
- The ability to complete a workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods
- The ability to interact appropriately with the general public
- The ability to accept instructions and respond appropriately to criticism from supervisors
- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

(*Id.*).

Dr. Anthony determined that Plaintiff was moderately impaired in the following areas:

- The ability to understand and remember locations and work-like procedures
- The ability to understand and remember detailed instructions
- The ability to carry out very short and simple instructions
- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision
- The ability to ask simple questions or request assistance
- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness
- The ability to respond appropriately to changes in the work setting
- The ability to be aware of normal hazards and take normal precautions
- The ability to set realistic goals and make plans independently of others

(*Id.*).

### 13. *Administrative Hearing: January 25, 2010*

A hearing regarding Plaintiff's application for SSI benefits was held on January 25, 2010 in Pittsburgh, Pennsylvania. (R. at 22). At said hearing, Plaintiff appeared with the assistance of counsel, Steven Kessler, Esquire. (*Id.*). Ms. Tanya Shullo,[24] a vocational expert, also appeared to testify. (*Id.*).

Plaintiff testified that she was last employed in 2000 and previously was a "very good worker" and "loved" her job working as a home health aide despite the fact that physically transporting elder adults damaged her back. (R. at 27). Prior to that job, Plaintiff worked for a cable company addressing customer concerns with accounts and technical issues, but she said the job did not last very long because she had "a hard time being around a large group of people." (R. at 28-29).

Regarding her daily routine, Plaintiff noted how strenuous daily tasks such as getting out of bed are for her. (R. at 30). She stated that she is "grateful" for what she has and notes that "things could be worse." (R. at 31). Each day, Plaintiff takes Flexeril, Suboxone, Motrin, and

---

[24] Ms. Shullo holds a Bachelor of Science degree from West Virginia University in Secondary Education, a Master of Arts degree from West Virginia University in Foreign Languages, and a Master of Science degree from West Virginia University in Rehabilitation Counseling. (R. at 113). She has fifteen years of experience as a vocational case manager, first with Wage Loss Consultants, and currently with Alternative Careers & Transitions, Inc. Ms. Shullo is a certified rehabilitation counselor and vocational expert. (*Id.*).

Lexapro. (R. at 31-32). She discussed her past sexual abuse by her father and noted that her only friends are her cousin and her friend, Stephanie. (R. at 32).

Plaintiff's cousin, Stacy Stumpf, next testified that she sees Plaintiff several times a month and runs errands for her. (R. at 36). According to her, Plaintiff has difficulty conducting typical household chores, such as cooking and cleaning, and cries often. (R. at 37). Finally, Ms. Tanya Shullo, a vocational expert, testified that Plaintiff's previous work experience amounted to semi-skilled work, as a nurse assistant and a driver, and skilled work, as a customer service representative. (R. at 38). Assuming an individual with Plaintiff's age, education, and work experience were capable of performing work consisting of simple and repetitive tasks without dealing with the general public at a sedentary level with an option to sit and stand each half hour, Ms. Shullo testified that this individual could perform the jobs of assembler, document preparer or sorter. (R. at 38-39). She estimated that 800,000 such jobs existed in the national economy. (R. at 39). If an individual required additional breaks of a half hour in the morning and the afternoon, Ms. Shullo testified that the individual would not be employable in these positions. (R. at 39).

### 14. *ALJ's Decision: February 4, 2010*

The ALJ issued his decision on February 4, 2010, concluding that Plaintiff is not under a disability within the meaning of the Social Security Act from May 15, 2006, and thus, he determined that Plaintiff was not entitled to SSI. (R. at 9). In so holding, the ALJ made the following determinations: 1) Plaintiff has not engaged in substantial gainful activity since May 15, 2006, the alleged onset date [...] (R. at 11); 2) Plaintiff has the following severe impairments: degenerative disc disease of the cervical and lumbar spine and major depression, recurrent, moderate (*Id.*); 3) Plaintiff does not have an impairment or combination of impairments that

meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (R. at 12); 4) Plaintiff has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 416.967(a) except that she should have the opportunity for a sit/stand option at intervals of one half hour and is limited to the performance of simple, repetitive tasks that do not require public contact. (R. at 14); 5) Plaintiff is unable to perform any past relevant work (R. at 16); 6) Plaintiff is a younger individual age 18-44 as of the alleged disability onset date (*Id.*); 7) Plaintiff has at least a high school education and is able to communicate in English (R. at 17); 8) transferability of job skills is not material to the determination of disability because under Medical-Vocational Rules, Plaintiff is "not disabled," regardless of the presence of transferable job skills (*Id.*); 9) considering Plaintiff's age, education, work experience, and residual functional capacity, jobs exist in significant numbers in the national economy that Plaintiff can perform (*Id.*); and 10) Plaintiff has not been under a disability, as defined in Social Security Act, from May 15, 2006 through the date of this decision (R. at 18).

The ALJ determined that Plaintiff had cervical and lumbar spine degenerative disc disease and major depression. (R. at 11). He also noted a discrepancy in Plaintiff's recollection of a car accident in July 2000 compared with the hospital report of the accident as reflecting poorly on her credibility. (R. at 12). He found that she was mildly restricted in activities of daily living and had moderate difficulties in social functioning, hence, he believes that Plaintiff's condition does not rise to the level of an impairment. (*Id.*).

## V.    DISCUSSION

Plaintiff argues that the ALJ's opinion is not supported by substantial evidence because 1) the ALJ failed to give proper weight to the medical opinions in the record and 2) the hypothetical question posed to the vocational expert by the ALJ incorporated an incorrect

residual functioning capacity assessment.  (Docket No. 11 at 5, 7, 10).  The Commissioner contends that disability standards and regulations pursuant to the Social Security Act are stringent, substantial evidence supports the ALJ's residual functioning capacity assessment, and the ALJ's evaluation of the evidence was proper.  (Docket No. 13 at 7, 8, 10).  The Court will address each of these arguments, in turn.

### A.    *Evaluation of Medical Opinions*

Plaintiff argues that the ALJ failed to properly consider the opinions of her treating physician, Dr. Campopiano, a consultative examiner, Dr. Danai, and her treating psychiatrist, Dr. Anthony.  (Docket No. 11 at 8).  However, the Commissioner maintains that the ALJ properly considered the medical opinions.  (Docket No. 13 at 10).

"In general, a treating physician's findings are entitled to great weight -considered conclusive unless directly contradicted by evidence in a claimant's medical record-particularly where the physician's findings are based upon 'continuing observation of the patient's condition over a prolonged period of time.'"  *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987)).  An ALJ may reject a treating physician's opinion outright on the basis of contradictory medical evidence, but also may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided.  *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985).  When rejecting a treating physician's findings or according such findings less weight, an ALJ must be as "comprehensive and analytical as feasible" and provide the factual foundation for the decision and specific findings that were rejected.  *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

Generally, an ALJ may not make speculative inferences from medical reports and is not free to employ his own expertise against that of a physician who presents competent medical evidence. *Fargnoli v. Massanari*, 247 F.3d 34, 37 (3d Cir. 2001). When a conflict in the evidence exists, the ALJ may choose what evidence to credit but "cannot reject evidence for no reason or for the wrong reason." *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993). The ALJ must consider all the medical evidence and give some reason for discounting the evidence he rejects. *Stewart v. Secretary of H.E.W.*, 714 F.2d 287, 290 (3d Cir. 1983); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (explaining that "when the medical testimony or conclusions are conflicting, the ALJ is not only entitled but required to choose between them"). Moreover, the ALJ must make enough factual findings so that the reviewing court has the ability to determine if "significant probative evidence was not credited or simply ignored." *Fargnoli*, 247 F.3d at 42.

### 1. *Physical Impairments*

Dr. Campopiano, Plaintiff's treating physician, determined that Plaintiff was capable of working a maximum of four hours per day. (R. at 564.). Similarly, Dr. Danai, a consultative examiner, found that Plaintiff was capable of standing or walking one to two hours per day and sitting for two hours per day. (R. at 422-423). After considering the testimony and documentary evidence, the ALJ determined that the Plaintiff had a physical residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 416.967 (a) except that she should have an opportunity for an option to sit and stand at intervals of one half hour. (R. at 14). He further determined that Plaintiff was limited to the performance of simple, repetitive tasks that did not require public contact. (*Id.*).

The Code of Federal Regulations defines sedentary work as the following:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967.

However, according to Social Security Ruling 83-12, if a person "must alternate between periods of sitting and standing," she "is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work or the prolonged standing or walking contemplated for most light work." SSR 83-12.

To qualify for sedentary work, an individual must be capable of working an eight hour workday. Indeed, our Court of Appeals has recognized this. "Periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." SSR 83-10. *See also Garibay v. Commissioner of Social Security*, 336 Fed.Appx. 152, 2009 WL 2008445 (3d Cir. 2009) ("Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday."). If the ALJ were to accept the opinions of Dr. Campopiano and Dr. Danai, Plaintiff would not qualify for sedentary work, because their suggestions that Plaintiff cannot work more than four hours do not meet the requirement of an eight hour workday.

The ALJ rejected these opinions, giving little weight to Dr. Campopiano's opinion and no weight to Dr. Danai's opinion, basing his reasoning for rejecting these opinions primarily on internal inconsistencies within the evidence. (R. at 15-16). The ALJ determined that Dr. Danai's assessment was "inconsistent" with his physical examination and the other medical

evidence in the file, and he believed it represented an "overestimate" of Plaintiff's limitations. (R. at 16). The ALJ also rejected the opinions of Dr. Campopiano, because of her decision to treat Plaintiff "conservatively" and the lack of any records in the file by Dr. Campopiano since April 2007.[25] (R. at 16).

In this Court's estimation, the weight given to these opinions is not supported by substantial evidence. While an ALJ may weigh conflicting evidence, she "may not make speculative inferences from medical reports and is not free to employ her own lay opinion against that of a physician who presents competent medical evidence." *Fargnoli*, 247 F.3d at 37. Here, the ALJ offers no medical evidence in support of the decision to reject the opinions. Thus, it appears from the record that the ALJ merely substituted his opinions for those of licensed medical practitioners.

The Court recognizes that the ALJ rejected the opinions of Dr. Campopiano in part because of her use of "check the box forms." (R. at 203-223). "Form reports," such as the type completed by Dr. Campopiano, "in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best" of disability, and when they are "unaccompanied by thorough written reports, their reliability is suspect." *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993). In this instance, Plaintiff's treating physician and the consultative examiner, Dr. Campopiano and Dr. Danai, found that Plaintiff could only work for a total of four hours per day, comprised of two hours of standing and two hours of sitting. (R. at 422, 564). Despite Plaintiff's reliance on "check the box" forms, the ALJ still does not point to any medical

---

[25] Plaintiff also argues that the ALJ did not consider Dr. Campopiano's opinions from 2007 to the time of the hearing, and she claims that these records run through July 14, 2009, indicating treatment for spondylolithesis and chronic pain. (Docket No. 11 at 8). On remand, the ALJ may consider these opinions and give them any weight to which he feels they are entitled. (R. at 16, 440-449, 443).

evidence of record to contrast these opinions supporting Plaintiff's ability to work an eight hour day.

It also appears to the Court that the ALJ did not consider some medical evidence of record, including that of the file examiner, Dr. Zhoyovsky. Dr. Zhoyovsky specifically states that Plaintiff is capable of sitting for six hours and walking three hours, and this analysis, if accepted, implies that Plaintiff would be capable of meeting the requirements of sedentary work. (R. at 430). While this opinion conflicts with the treating physician and consultative examiner, the ALJ makes no reference to this opinion in the decision to deny Plaintiff benefits. This Court cannot substitute this evidence to rectify the lack of factual findings in the ALJ's decision. *Fargnoli*, 247 F.3d at 44 n. 7 (noting that the district court cannot substitute its own factual findings to rectify a flawed decision by an ALJ). Accordingly, the ALJ's decision is not supported by substantial evidence.

### 2. *Mental Impairments*

In making a determination regarding Plaintiff's mental impairments, the ALJ rejected the opinion of treating psychiatrist, Dr. Anthony, in favor of the opinions of Dr. Glover, Dr. Fallica, and Dr. Frantz. (R. at 15). In so doing, the ALJ adopted Dr. Glover's opinions that Plaintiff can sustain an ordinary routine without special supervision and can function in production oriented jobs requiring little decision making. (R. at 400-401). However, in his decision, the ALJ did not mention any of Plaintiff's GAF scores throughout her treatment.

Plaintiff claims the ALJ's failure to discuss Dr. Anthony's GAF scores requires remand, relying on *Colon v. Barnhart* to support her argument. In *Colon v. Barnhart*, because the ALJ only considered two GAF scores, the court remanded the case to consider the full range of GAF scores, including two scores that fell below 50, indicating severe symptoms. 424 F. Supp. 2d

805, 815 n.7 (E.D. Pa. 2006). Defendant cites *Gilroy v. Astrue* for the propositions that a GAF score is not dispositive in a disability determination and that an ALJ was not required to discuss GAF scores where the ALJ discussed the treating sources' reports containing the records. *Gilroy v. Astrue*, No. 08-4908, 2009 WL 3720580, at *1 (3d Cir. Nov. 9, 2009). In *Gilroy*, the Court of Appeals held that a single GAF score of 45 or 50 is not conclusive evidence of a mental disability. (*Id.*). In this Court's estimation, *Gilroy* is distinguishable and *Colon* is more persuasive, given the fact that the ALJ in this case made no mention of any of the GAF scores in the record, despite the presence of numerous scores demonstrating severe symptoms.[26]

Generally, a GAF score may be disregarded or accorded little weight depending upon its consistency with the claimant's record as a whole, similar to other record evidence. Where a GAF score is inconsistent or unsupported by a physician's other findings or might be an inaccurate indication of present mental impairment due to inconsistency with the whole record, the ALJ is justified in rejecting the GAF score. *Torres v. Barnhart*, 139 Fed. Appx. 411, 415 (3d Cir. 2005). However, "[a] GAF score of 41 to 50 indicates that in the opinion of the evaluator the patient has serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Gilroy*, 2009 WL 3720580, at *1 (citing Diagnostic and Statistical Manual of Mental Disorders).

In this instance, Plaintiff's GAF scores throughout her treatment at Mercy Behavioral Health never rose above 50. (R. at 281-377, 560). Yet, the ALJ fails to mention any of Plaintiff's GAF scores in his opinion. Again, the ALJ must provide "not only an expression of

---

[26] American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, *supra* note 19. ("An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)").

the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705. There is no such indication in the record. While the ALJ discussed the treatment Plaintiff received from both Dr. Frantz and Dr. Anthony, his failure to address multiple GAF scores each psychiatrist assigned to her was in error. Dr. Anthony is Plaintiff's treating psychiatrist, and the GAF scores support his opinions that Plaintiff was extremely impaired in her ability to carry out detailed instructions and to travel in unfamiliar places or use public transportation and that Plaintiff is markedly impaired in her ability to understand and remember short and simple instructions; to maintain attention and concentration for extended periods; to work in coordination with and proximity with others without being distracted by them; to complete a workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to get along with coworkers and peers without distracting them or exhibiting behavioral extremes. (R. at 560-561).

Because the ALJ did not provide any reasoning for his decision to exclude Plaintiff's GAF scores from his opinion, the decision is not supported by substantial evidence. On remand, the ALJ should also reconsider the Plaintiff's mental RFC in light of the various GAF scores presented and the weight to be given to the opinions of Plaintiff's treating psychiatrist.

### B.     *Hypothetical Question to Vocational Expert and Residual Functional Capacity*

Plaintiff also avers that the hypothetical question posed by the ALJ to the vocational expert incorporated an improper residual functional capacity. (Docket No. 11 at 6-7). She relies on *Boone v. Barnhart* for the proposition that a plaintiff who requires the option to sit or stand

every thirty minutes is precluded from performing sedentary work. 353 F.3d 203 (3d Cir. 2003). Plaintiff also cites to Social Security Ruling 83-12, which, as noted above, indicates that an individual who requires the option to sit or stand at particular intervals is not functionally capable of the prolonged sitting required by sedentary work. (R. at 38). However, the Commissioner argues that the holding in *Boone* is more limited, and that SSR 83-12 does not automatically dictate a finding of disability where an individual is limited to sedentary work with a sit/stand option; rather, it indicates only that a vocational expert should be consulted in that situation.

Social Security Ruling 83-12 makes clear that if a person "must alternate between periods of sitting and standing," she "is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work or the prolonged standing or walking contemplated for most light work." SSR 83-12. When a plaintiff requires the option to sit or stand at will and has the ability to perform only unskilled work, the court may not assume that an ALJ's finding that a plaintiff can perform a limited range of light work means that she can perform a significant number of jobs in the economy. *Boone*, 353 F.3d at 211. However, *Boone* does not stand for the proposition that an individual requiring the option to sit or stand at specific intervals is per se disabled. As the Commissioner suggests, the Third Circuit Court of Appeals has since limited the holding of *Boone* in later decisions, explicitly stating, "SSR 83-12 does not automatically dictate a finding of disability where an individual is limited by a sit/stand option. Rather, SSR 83-12 indicates that a VE should be consulted […]" *Martin v. Barnhart*, 240 Fed.Appx. 941, 946 (3d Cir. 2007). The Court further distinguished the facts in *Boone* as a unique situation in which "there was a much more explicit conflict" than a typical case, and "the

VE's testimony was riddled with hesitation." *Jones v. Barnhart*, 364 F.3d 501, 506 n. 6 (3d Cir. 2004).

On remand, if Plaintiff's physical residual capacity changes after the ALJ's reevaluation of the medical record, the ALJ will be required to reexamine his conclusion achieved at step five of the analysis promulgated by the Social Security Administration: whether work exists in significant numbers in the national economy that Plaintiff can perform given his medical impairments, age, education, past work experience, and RFC. *See* 20 C.F.R. § 404.1520(a)(4)(v). The ALJ should then pose a hypothetical question to a vocational expert that reflects Plaintiff's impairments as supported, by medical evidence. *Yensick v. Barnhart*, 245 Fed.Appx. 176, 184, 2007 WL 2326841 (3d Cir. Aug. 16, 2007) (citing *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)).

After the ALJ includes all of the Plaintiff's impairments in his hypothetical question to the vocational expert, he should consider the expert's response as to whether work exists in significant numbers in the national economy that Plaintiff could perform. *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002). At that point, the ALJ may then render his decision as to whether Plaintiff is disabled.

## VI.    CONCLUSION

Based upon the foregoing, Plaintiff's Motion for Summary Judgment (Docket No. 9) is GRANTED, and Defendant's Motion for Summary Judgment (Docket No. 12) is DENIED, and the matter is REMANDED for further consideration by the ALJ.    An appropriate Order and Judgment follow.


*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge


Dated:  February 4, 2011


cc/ecf:  All parties of record